

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| CORNERSTONE PRODUCTS, INC., | § | Case No. 05-53533 |
| | § | (Chapter 11) |
| Debtor. | § | |
| _____ | § | |
| CORNERSTONE PRODUCTS, INC. | § | |
| and SUNDANCE GENERAL, LLC, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Adv. Proc. No. 05-4217 |
| | § | |
| PILOT PLASTICS, INC. and FIRST | § | |
| UNITED BANK AND TRUST CO., | § | |
| | § | |
| Defendants. | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter is before the Court following the trial of the Second Amended Complaint to Determine Validity and Priority of Alleged Liens, Allowance of Claims, Avoidance of Preferential Transfers, Conversion of Property and for Turnover (the "Complaint") filed by Cornerstone Products, Inc. ("Cornerstone") and Sundance General, LLC ("Sundance," together with Cornerstone, the "Plaintiffs") against Pilot Plastics, Inc. ("Pilot") and First United Bank & Trust Company ("FUB," together with Pilot, the "Defendants").[1]  By the Complaint, the Plaintiffs seek a judgment that: (1) Pilot waived any right to assert a lien on Cornerstone's molds under Ohio law (**Count 1**); (2) even if Pilot did not waive its right to assert a molder's lien, FUB's secured interest in the molds

---

[1] The Complaint also asserts claims against Bloom Industries, Inc., Champion Molded Plastics, Edge Plastics, Inc., and Rural Enterprises, Inc.  However, following the commencement of trial, the Plaintiffs settled or otherwise resolved their claims against all of the defendants except Pilot and FUB.

and equipment has priority (**Count 2**); (3) the Plaintiffs are entitled to turnover of any molds and equipment still in Pilot's possession and damages for failure to turnover the resin and inventory (**Counts 12 and 13**); and (4) the claim asserted by Pilot in Cornerstone's bankruptcy case should be reduced or disallowed (**Count 7**).  Additionally, in its answer to the Complaint, Pilot seeks a declaratory judgment that it holds a valid, first priority molder's lien as set forth in its proof of claim.

The Court tried the Complaint on December 14, 2006 and continuing through December 18, 2006.  At the request of the Court, the parties submitted post-trial briefing regarding the ownership of manufactured items and their component raw materials under Ohio law.  Upon consideration of the pleadings, the evidence presented, and the arguments made at trial and in the parties' post-trial briefs, the Court makes the following findings of fact and conclusions of law.

**FINDINGS OF FACT**

*A. Relevant Procedural History*

1.       Cornerstone filed a bankruptcy petition under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") on July 5, 2005 (the "Petition Date").

2.       In its Schedule D – Creditors Holding Secured Claims ("Schedule D"), Cornerstone listed Pilot as a secured creditor with a disputed claim in the amount of $684,415.00.  Cornerstone stated in its Schedule D that Pilot claimed a "[m]olders' lien per statutes" on ten molds in Pilot's possession.  Cornerstone valued the ten molds at $1,052,621.98 and described Pilot's claim as disputed as to both secured status and amount.

3.       On or about August 31, 2005, Pilot filed a proof of claim in Cornerstone's

2

bankruptcy, asserting a secured claim in the amount of "$762,443.64+".  Pilot asserted that its claim is secured by "molds, forms, etc."  According to the documents attached to Pilot's claim form, Pilot is owed $736,441.57 for unpaid purchase orders from August 2004 through February 2005.  Pilot's claim also includes a charge of $21,032.07 dated April 23, 2005 as well as $5,000 in pre-petition attorneys' fees.

4.     On January 9, 2006, Cornerstone filed its Second Amended Plan and Second Amended Disclosure Statement.  The Second Amended Plan provided that, upon confirmation, a Trust would be created to hold the "Trust Assets" for the benefit of Cornerstone's creditors.  *See* Second Amended Plan, art. VI, §6.01.  The Second Amended Plan further provided that, following confirmation, the Trust would retain every power granted to a trustee under the Bankruptcy Code.  *See* Second Amended Plan, art. VII, §7.06(t).

5.     Under the Second Amended Plan, most of Cornerstone's claims and causes of action were "preserved and retained for enforcement by and for the benefit of the Trust . . . ."  *See* Second Amended Plan, art. X, §10.01.  However, "Specified Causes of Action" were preserved and retained for enforcement by Cornerstone and Sullivan Liquidations (either jointly or severally) for the benefit of the Trust . . . .  Cornerstone and Sullivan Liquidations were jointly appointed as the representatives of the Estate pursuant to Section 1123(b)(3) of the Code to pursue the Specified Causes of Action . . . .  *See* Second Amended Plan, art. X, §10.02.  Cornerstone's Second Amended Plan defined "Specified Causes of Action," in relevant part, as "the Causes of Action by the Debtor or the Estate against any Contract Molder or Resin Supplier of the Debtor[.]"  *See* Second Amended Plan, art. I, § 1.65.

6.     The Second Amended Plan defined "Sullivan Liquidations," in relevant part, as "the company to be formed by Reggie Sullivan to fund the pursuit of the Specified Causes of Action …." *See* Second Amended Plan, art I, §1.68.  The Second Amended Plan provided, in relevant part, that Reggie Sullivan would pay the cost of pursuing the Specified Causes of Action and that Sullivan Liquidations would have a pecuniary interest in any affirmative recover on certain of the Specified Causes of Action. *See* Second Amended Plan, art I, §1.65

7.     On February 16, 2006, the Court entered an Order Confirming Second Amended Plan of Liquidation for Cornerstone Products, Inc. as Modified (the "Confirmation Order").

### B. General Facts

8.     Prior to bankruptcy, Cornerstone was in the business of designing, manufacturing and marketing plastic container products, including indoor and outdoor waste containers, storage totes and bins, laundry baskets and hampers, and commercial trash cans.  Cornerstone and its predecessors invested as much as $20 million in creating the molds used to manufacture products.  Cornerstone's name was etched into each mold so that the name would be stamped into the finished products.

9.     Cornerstone granted a lien on its molds and equipment to its lenders, FUB and Fleet Capital Corporation ("Fleet").  Fleet and FUB entered into an Intercreditor Agreement dated February 7, 2003, regarding, among other things, the priority of their respective liens on Cornerstone's molds.

10.     At the time the bankruptcy was filed, FUB and its affiliates were owed approximately $8.7 million secured by, among other things, the same molds in which

4

Pilot asserts a molder's lien.  FUB and its affiliates have a valid and perfected security interest in the same molds in which Pilot asserts a molder's lien.

11.     Cornerstone's manufacturing facility was located in Durant, Oklahoma. In or around 2003, Cornerstone began outsourcing a portion of its business with outside contract molding partners located in the eastern United States.  Cornerstone did so at the request of certain of its customers, who wanted to reduce their freight costs.

12.     Fleet and FUB required that each of Cornerstone's contract molders execute lien waivers as well as bailment agreements.  Reggie Sullivan, who was the president and chief operating officer for Cornerstone at all relevant times, testified that the purpose of the lien waivers and the bailment agreements was to prevent the contract molders from "hanging on" to Cornerstone's molds.

13.     Cornerstone supplied molds, equipment and resin to its contract molding partners.  Cornerstone supplied two types of resin: PPHIBC resin (or cloudy resin) and PPRCC resin (or clear resin).  Approximately 65% of the cost of manufacturing a product is attributable to the resin.  The industry standard for plastic molding of the type requested of Cornerstone's contract molding partners allows for two percent (2%) scrap, meaning that approximately two pounds of every 100 pounds of resin may be lost during the production process.

14.     Cornerstone issued purchase orders to the molders for particular products. After a purchase order was received and accepted by a molder, and after the molder had received all the necessary raw materials, the molder would set one of Cornerstone's molds into a press and commence production.  The molding process frequently created overruns.  These overruns were generally retained by the molders and used to complete

future purchase orders received from Cornerstone.

15.     Most of the goods manufactured for Cornerstone involved molding more than one item to create a finished product.  For a trash can or a tote, for example, the molders used Cornerstone's molds to create both a lid and a base.  The molders supplied screws and other items necessary to assemble and label the goods.  The finished goods were then shipped to Cornerstone at the Akron Storage Warehouse.

16.     During 2005, Cornerstone occasionally cancelled orders after the molders had begun production.  Cornerstone did not pay the molders for any unfinished products or any work performed in connection with cancelled purchase orders.

17.     Cornerstone tracked how much resin it had ordered, how much resin it had delivered to molders, what products it had ordered, and how much resin should have been used in producing particular products.  However, Cornerstone's tracking system did not identify particular molders, nor did Cornerstone's system track shipment or production information relating to any particular molder.

18.     Initially, Cornerstone conducted quarterly inventories of the molds, equipment and resin it had supplied to its contract molding partners in Ohio.  Cornerstone subsequently discovered large variances between the inventory in its books and records and the actual materials on hand at the Ohio facilities during physical inventories.  Approximately a year and a half prior to filing for bankruptcy, Cornerstone began conducting monthly inventories of its resin and work in progress located at the Ohio molder's facilities.

19.     Cornerstone provided daily borrowing certificates to Fleet in which Cornerstone listed its inventory, resin, finished goods and work in progress.  Fleet sent a

representative to monitor some of the physical inventories conducted at the Ohio molders' facilities.

20.     At some point after filing for bankruptcy, Cornerstone decided to liquidate its assets.  Cornerstone conducted a physical inventory at all of the facilities belonging to its contract molders in November 2005 in connection with the anticipated liquidation of its assets.  Cornerstone's inventory of Pilot's facility is discussed below.

### C. Facts Specific to Pilot

21.     Pilot is engaged in the business of plastic injection molding within the State of Ohio.  Pilot's principal corporate offices are located in Peninsula, Ohio.  Ted Jendrisak is the owner and president of Pilot.

22.     In 2004, Cornerstone outsourced a portion of its plastic injection molding business with Pilot.

23.     On or around August 10, 2004, Cornerstone executed with Pilot (a) a document entitled "Agreement to Manufacture, Warehouse and Ship Products for Cornerstone Products, Inc." (the "Manufacturing Agreement"), (b) a document entitled "Bailment Agreement" (the "Bailment Agreement") and (c) a document entitled "Lien Waiver and Acknowledgment" (the "Lien Waiver") in favor of Fleet Capital Corporation ("Fleet").  As previously discussed, Fleet required Cornerstone to obtain an executed bailment agreement and lien waiver from Pilot prior to Cornerstone's delivery of any mold to Pilot.

24.     The Manufacturing Agreement between Pilot and Cornerstone was a highly negotiated document.  The Manufacturing Agreement provided, among other things, that Cornerstone would pay Pilot "for production based on orders submitted by

Cornerstone" and that such payments would be made weekly for invoices that were "approximately 60 days from the date of invoice." The Manufacturing Agreement required, among other things, that Pilot execute a waiver agreement in favor of Fleet and Cornerstone's standard form Bailment Agreement.

25.     The Bailment Agreement was based on a standard form agreement drafted by Cornerstone. The Bailment Agreement executed by Pilot provided in pertinent part:[2]

> • "The Molding Equipment is, and will at all times remain and be deemed to be, the sole and exclusive personal property of Cornerstone."

> • "Pilot shall have no right, title or interest in the Molding Equipment, except as expressly set forth in this Agreement."

> • "Pilot shall keep the Molding Equipment free and clear of all liens claims and encumbrances."

Bailment Agreement at ¶ 4.

26.     Fleet drafted the Lien Waiver, which defined "Inventory" as including "raw materials, works-in-progress, and finished goods." In paragraph 3 of the Lien Waiver, Pilot agreed that "the Inventory is, and will at all times be deemed to be, the sole and exclusive property of Cornerstone" and that it would "keep the inventory free and clear of all liens and encumbrances." The Lien Waiver further provided --

> Pilot hereby waives and releases … any and all liens, security interests, ownership rights, claims or title to all of the Inventory, which now or hereafter is, or may be, held by Pilot. The foregoing does not affect any of Pilot's right to payment as against Cornerstone.

Lien Waiver at ¶1.

---

[2] Cornerstone executed a similar bailment agreement with Champion Molded Plastics ("Champion") on or about January 20, 2003. The first numbered paragraph of Champion's bailment agreement included the following provision: "Upon the termination of this Agreement, Molder shall immediately deliver the Molding Equipment to Cornerstone, subject to the terms of the molder's lien provided for under Ohio law." The fourth numbered paragraph stated, in pertinent part, that "Molder shall keep the Molding Equipment free and clear of all liens and encumbrances except those provided by Ohio law." This carveout of the molder's lien is not contained in the documents executed by Pilot.

27.     As a result of Pilot's execution of the Lien Waiver and the Bailment Agreement, Cornerstone supplied its molds and resin to Pilot.  If the resin was delivered in a box or bag, Pilot stored the resin in the box or bag until it was needed.  Otherwise, the resin was transferred to and stored in silos at Pilot's facility.  The silos were not marked or calibrated in any way for measuring their contents.

28.     According to Pilot, the resin it was receiving from Cornerstone at or around the end of 2004 was of poor quality.  Additionally, in or around December 2004, Pilot began having trouble getting paid for its work for Cornerstone.  Cornerstone occasionally sent payments to Pilot after Pilot refused to ship the products it had manufactured for Cornerstone.

29.     On January 28, 2005, Cornerstone visited Pilot's facility and conducted a physical inventory of the resin, finished product and product-in-process at Pilot's location.  Pilot continued to manufacture products for Cornerstone after this date, and Cornerstone continued to provide Pilot with raw material resin.

30.     Pilot ceased manufacturing product for Cornerstone on or about February 8, 2005.  In a letter dated March 23, 2005, Pilot gave Cornerstone final notice of amounts due and owing to Pilot for unpaid invoices pursuant to Ohio Revised Code §1333.31(B)(1).

31.     On March 25, 2005, Pilot conducted a physical inventory of the resin, finished product and product in process at its facility.  Cornerstone's business records showed that 23,542 pounds of clear resin and 262,627 pounds of cloudy resin should have been on Pilot's premises on March 25, 2005.  However, Pilot counted only 10,000 pounds of cloudy resin shipped to it by Cornerstone and 24,062 pounds of items

manufactured for Cornerstone at its facility.  Pilot did not allow Cornerstone onto its premises for the inventory but supplied the results of the inventory to Cornerstone.

32.     Cornerstone conducted its own physical inventory at Pilot's facility on April 19, 2005.  Similar to the figures provided to it by Pilot in March, Cornerstone counted 11,000 pounds of cloudy resin and approximately 32,000 pounds of items manufactured for Cornerstone.

33.     In connection with the liquidation of its assets in its bankruptcy case, Cornerstone conducted a final physical inventory at Pilot's location on November 2, 2005.  Consistent with the inventory reported to Cornerstone by Pilot on March 25, 2005 and its own inventory on April 19, 2005, Cornerstone counted approximately 29,000 pounds of finished product and product in process at Pilot's facility as well as 11,000 pounds of cloudy resin.

34.     In or around February 2006, Cornerstone attempted to auction the molds in Pilot's possession.  Its efforts resulted in $172,075 in aggregate offers, including bid premiums.  Pilot, however, refused to release the molds or consent to their sale.  The following molds remained in Pilot's possession at the time of trial: (1) Latch – Sliding Lid (1166C/9-16); (2) Lid – 18 Gallon Econo Tote – Stack (1018A/23-24); (3) Lid – 30 Gallon Econo Tote – Stack (1030A/5-6); (4) Lid – 60 Quart Clear – Stack (1162A/9-10); (5) Base – 30" Wrap and Store (1830B/2); (6) Base 18-Gallon Econo – Tote (1018B/27-28); (7) Base – 30 Gallon Econo Tote (1030B/5); (8) Hood – Wrap-n-Store Tote (1850A/3); (9) Base – 30 Gallon Econo Tote (1030B/6); (10) Base – 60 Quare Clear (1161B/3-4).

### *D. The Parties' Claims*

35.     Prior to Cornerstone's bankruptcy, on April 25, 2005, Pilot brought suit against Cornerstone in the Court of Common Pleas, Summit County, Ohio, seeking to foreclose on and sell Cornerstone's molds pursuant to Ohio Revised Code §1333.31. This action was stayed by Cornerstone's bankruptcy case.  Pilot attached a copy of the state court complaint to its proof of claim filed in Cornerstone's bankruptcy case.

36.     In a letter dated October 20, 2005, Cornerstone demanded that Pilot return the equipment and property provided by Cornerstone pursuant to the Bailment Agreement.  The Bailment Agreement provides in pertinent part that it shall terminate "upon Cornerstone's demand for re-delivery of the Molding Equipment . . . ."  Bailment Agreement at ¶ 1.

37.     On October 21, 2005, Cornerstone initiated this adversary proceeding against multiple Ohio molders, including Pilot.  The Court subsequently entered an order adding Sundance, which is the company formed by Reggie Sullivan in accordance with the Second Amended Plan, as an additional plaintiff.  Final Orders have been entered with respect to all defendants except Pilot, leaving Pilot as the sole remaining defendant.

38.     In this adversary proceeding, the Plaintiffs assert claims against Pilot relating to the molds, finished product and work-in process that are in Pilot's possession or that should be in Pilot's possession.  The Plaintiffs assert that Pilot failed to account for and converted for its own use 23,542 pounds of clear raw resin material and 228,585 pounds of cloudy raw resin material.  The Plaintiffs assert that the missing resin is worth $153,253.86.  The Plaintiffs further assert that the resin used to make the lids and bases

that remained in Pilot's possession as of November 2, 2005 is worth $4,781.00 based the value of raw cloudy resin as of November 2, 2005.

39.    Pilot asserts a molder's lien on the molds in its possession under Ohio law. With respect to the allegedly missing resin, Pilot asserts that it used all of the resin supplied by Cornerstone to manufacture products for Cornerstone.

## CONCLUSIONS OF LAW

40.    This Court has jurisdiction to consider the Complaint pursuant to 28 U.S.C. §§1334 and 157(a).  The Court has the authority to enter a final judgment in this adversary proceeding since it constitutes a core proceeding as set forth in 28 U.S.C. §157(b)(2)(A), (B), (C), (E), (K), and (O).

### *A. Validity of Pilot's Molder's Lien*

#### 1. Pilot's Contractual Obligations and Waiver

41.    At the time of trial, Pilot had possession of ten molds owned by Cornerstone.   Pilot asserted a possessory lien on the molds under Ohio law.   The Plaintiffs disputed the validity of Pilot's lien.   Alternatively, the Plaintiffs asserted that FUB's secured interest in the molds has priority.

42.    The Ohio Revised Code provides that a molder has a lien on a die, mold, pattern, or form that is in his possession and that belongs to a customer for the work performed with the die, mold pattern or form.  *See* OHIO REV. CODE §1333.31(A)(1). The molder can retain possession of the die, mold or pattern until paid.  *See* OHIO REV. CODE §1333.31(A)(2).   A molder's lien arises automatically and is perfected by possession.  *See In re Flue Gas Resources,* 77 B.R. 628 (Bankr. N.D. Ohio 1987); *Int'l Extrusions, Inc. v. PM Sec. Rolling,* 1995 WL 546924 (Ohio Ct. App. 8th Dist. 1995) (unpublished).

43.     Section 545 of the Bankruptcy Code addresses the avoidance of statutory liens on property of the debtor.  *See* 11 U.S.C. §545.  Section 545(2) states that the trustee may avoid a statutory lien on property of a debtor to the extent that the lien is not perfected or enforceable against a bona fide purchaser at the time the bankruptcy case is commenced.  *See* 11 U.S.C. §545(2).

44.     In their Joint Pretrial Order, the parties agree that the right to enforce a statutory lien, such as a mechanic's lien or a molder's lien, may be waived by contract or agreement.  *See generally* 42 OHIO JUR. 3d *Estoppel and Waiver* § 94 (collecting cases).  However, to constitute a waiver, certain elements are essential.  There must be (1) an existing right; (2) knowledge, actual or constructive, of the existence thereof; (3) an intention to relinquish such right; (4) and, where the waiver is based upon an agreement, consideration is also necessary.  *See id.; cf. Connecticut Gen. Life Ins. Co. v. Birzer Bldg. Co.*, 101 N.E.2d 408, 416 (Ohio Com. Pl. 1950) ("The right to a mechanic's lien is a valuable legal right, the surrender of which by release, or otherwise, except estoppel, must be supported by a valuable consideration to be effective."); *Beebe Constr. Corp. v. Circle R. Co.*, 226 N.E.2d 573, 576 (Ohio Ct. App. 4th Dist. 1967) (adopting reasoning of *Connecticut Gen. Life Ins. Co.*).

45.     Here, Pilot's owner and president, Ted Jendrisak, testified that he knew at the time he signed the Bailment Agreement that there was an Ohio molder's lien statute that gave Pilot a lien on molds.  Pilot further understood at the time it signed the Bailment Agreement and Lien Waiver that if it did not sign, it would not get Cornerstone's business. As a result of executing the documents, including the Bailment Agreement, Pilot acquired Cornerstone's business, which was important to Pilot.  Therefore, the

13

Court concludes that Pilot knew of its right to a molder's lien and received consideration for the release of its molder's lien by obtaining Cornerstone's business as set forth in the Manufacturing Agreement.

46.     The Court now turns to the remaining issue – whether Pilot intentionally waived its statutory molder's lien.  Generally, a clear and unambiguous provision in a contract waiving the right to enforce a statutory lien or agreeing not to file a lien is valid and binding.  *See generally* 28 AM. JUR. 2d *Estoppel and Waiver* § 214 (collecting cases). The four corners of the contract control, *J.M. Krupar Constr. Co. v. Rosenberg*, 95 S.W.3d 332, 334 (Tex. App. – Houston [14th Dist.], 2002), unless the contract is deemed ambiguous, *Clear Lake City Water Authority v. Kirby Lake Dev., Ltd.*, 123 S.W.3d 735, 744 (Tex. App. – Houston [14th Dist], 2003, rev. den.).  *See also, e.g., Inland Refuse Transfer Co. v. Browning-Ferris Indus. of Ohio Inc .,* 474 N.E.2d 271 (Ohio 1984).  If the terms of the contract are ambiguous, parol evidence of the parties' intent is admissible to interpret, but not to contradict, the express language of the contract.  *See Inland Refuse Transfer Co.,* 474 N.E.2d at 273.

47.     Here, the Bailment Agreement states that (i) "the Molding Equipment is, and will at all times remain and be deemed to be, the sole and exclusive personal property of Cornerstone," (ii) "Pilot shall have no right, title or interest in the Molding Equipment" and (iii) "Pilot shall keep the Molding Equipment free and clear of all liens claims and encumbrances."  Notably, Champion, another Ohio molder, understood Cornerstone's standard form Bailment Agreement to constitute a waiver of its molder's lien and obtained a carve-out for its lien rights. Thus, it appears from the four corners of the Bailment Agreement that Pilot has waived any liens against the Molding Equipment.

14

48.     Even if the Court were to determine that the Bailment Agreement was ambiguous, the result would be the same.  Cornerstone had previously pledged the molds to FUB, and FUB required Cornerstone's contract molders to execute the Bailment Agreement.  Cornerstone and its predecessors had more than $20 million dollars invested in the molds.  Additionally, Cornerstone was concerned that, if it "had an issue with a molder," the molder might hold up production by asserting rights against the molds and preventing Cornerstone from moving the molds.   Trial Tr. 22-23, Dec. 15, 2006.  Cornerstone would not have put the molds in Pilot's possession if Pilot had not waived its lien rights. *See* Trial Tr. 24, Dec. 15, 2006.

49.     It was Cornerstone's intent that the language in the Bailment Agreement would waive Pilot's lien rights.  At the time the Bailment Agreement was executed, Cornerstone and Pilot discussed a carve-out of the molder's lien from the Bailment Agreement, but Cornerstone adamantly refused to "allow any rights to a lien of any form on the . . . molds."  Trial Tr. 30, Dec. 15, 2006.  Pilot thereafter signed the Bailment Agreement.  Pilot understood that it was waiving its molder's lien when it signed the Bailment Agreement and intended to do so in order to induce Cornerstone into executing the Manufacturing Agreement.

50.     The Manufacturing Agreement, the Bailment Agreement and the Lien Waiver were executed on the same date, cross reference each other, are between the same parties, and arise out of the same transaction.  Neither document renders any provision of the other a nullity.  Their terms are consistent.  The Bailment Agreement protects Cornerstone's right as well as the rights of a pre-existing lender with a security interest in the molds, and the Lien Waiver protects the rights of a pre-existing lender with a security

interest in the inventory.

51.     Nonetheless, Pilot argues that the language difference between the Bailment Agreement, which requires Pilot to keep the molding equipment free of encumbrances, and the Lien Waiver, which waives liens against the inventory, is significant.  Having reviewed the documents, it appears that the language is a function of the different circumstances of the parties.  The language difference may also be attributed, in part, to the fact that the Bailment Agreement is Cornerstone's standard form and the Lien Waiver was drafted by Fleet to protect its own interest.

52.     The Bailment Agreement was executed on August 10, 2004 along with the Manufacturing Agreement.  At that time, the Molding Equipment was not in Pilot's position, and there was no then-existing lien for Pilot to waive.  Other the other hand, the Lien Waiver, which was *effective as of* August 10, 2004, states that "[a]ll or some of the Inventory is now . . . in Pilot's possession."  Inasmuch as the Manufacturing Agreement describes the Lien Waiver as a Landlord Waiver Agreement, it is apparent that Pilot could have asserted a landlord's lien on the inventory that was currently in its possession when the Lien Waiver was executed.  The language in the Lien Waiver was needed to obtain a waiver of an existing right and an agreement that the lien would not attach in the future.  The fact that the inventory lender chose not to use the language from the Bailment Agreement in its lien waiver was reasonable and prudent since the language in the Bailment Agreement would have been insufficient to waive an existing lien.

53.     Based on the foregoing, the Court concludes that, under the circumstances, Pilot expressly waived its right to assert a molder's lien in the Cornerstone-Pilot Contract. The Court further concludes that Pilot's waiver of its right to assert a lien on the Molding

Equipment was part of the overall mutual consideration between the parties to the Manufacturing Agreement.

### 2. Relief From Pilot's Contractual Obligations and Waiver

54.     Although Pilot executed a Bailment Agreement requiring it to keep Cornerstone's molding equipment free of all liens, Pilot asserts that it should be relieved of any obligation to keep the molding equipment free of its own statutory molder's lien. Pilot argues that the Court should conclude that the Lien Waiver, Bailment Agreement, and Manufacturing Agreement are all part of one integrated manufacturing contract.[3] Pilot further argues that, because Cornerstone breached the integrated contract by failing to pay amounts due under the Manufacturing Agreement, Pilot is relieved of its contractual waiver under the Bailment Agreement.

55.     In general, a statutory lien, once waived, cannot be revived by the other party's failure to abide by another independent covenant in the contract such as an obligation to make payments.  *See generally* J.A. Bock, *Validity and Effect of Provision in Contract Against Mechanic's Lien*, 76 A.L.R.2d 1087 (collecting authority).  *Cf. Steveco, Inc. v. C&G Investment Associates*, 1977 WL 200326 at 3 (Ohio Ct.App. 10th Dist. 1977) ("… mechanic's lien, once waived, cannot be revived by the owner's failure to abide by other independent covenants in the contract.").  The purpose of a statutory molder's liens is to ensure that the party entitled to payment can rely on the lien should the other party fail to pay.  A waiver of a molder's lien would be meaningless if the lien were revived based on a failure to pay.  *Cf. Better Home Improvement Corp. v. Forovous*

---

[3]Under Ohio law, separate writings "executed as part of the same transaction should be read together."  *Edward A. Kemmler Memorial Foundation v. 691/733 East Dubin-Granville Road Co.*, 584 N.E.2d 695, 698 (Ohio 1992) (citing *Center Ridge Ganley, Inc. v. Stinn*, 31 Ohio St.3d 310, 314, 31 OBR 587, 590, 511 N.E.2d 106, 109 (Ohio 1987); *White v Brocaw*, 14 Ohio St. 339, paragraph 3 of syllabus (Ohio 1863); *Thayer v. Luce*, 22 Ohio St. 62, paragraphs one and two of syllabus (Ohio 1871)).

*Realty Corp.*, 235 N.Y.S.2d 209, 212-13 (N.Y. Sup. Ct. 1962) (revival of waiver of right to file mechanic's lien upon other party's breach of contract would render the waiver a nullity); *Jankoviak v. Butcher*, 159 N.E.2d 377, 378-79 (Ill. App. Ct. 1959) (same); *Hammond Hotel & Improvement Co. v. Williams*, 176 N.E. 154, 159 (Ind. App. 1931, reh'g denied) (same).

56.     Moreover, the interpretation of the Cornerstone-Pilot Contract urged by Pilot would run counter to basic principles of contract interpretation.  *See State v. Bethel*, 854 N.E.2d 150, 166 (Ohio 2006) (courts must construe contracts to give meaning to every contractual provision).  There were no conditions to Pilot's contractual obligation to return the molds upon demand or to Pilot's contractual obligation to keep the molds free of liens and encumbrances.  Delivery of the Bailment Agreement and the resulting waiver was required by, and for the benefit of, FUB.  The Bailment Agreement is, therefore, independent of the obligations contained in the Manufacturing Agreement and the obligation to keep the molds free from encumbrances was unconditional and independent.

57.     For the foregoing reasons, the Court concludes that Pilot's right to a molder's lien was not revived by Cornerstone's failure to pay Pilot pursuant to the Cornerstone-Pilot Contract.  The Court further concludes that Pilot cannot claim a valid molder's lien on the Molding Equipment.  Accordingly, the claim asserted by the Plaintiffs in Count 1 of the Complaint should be granted.

### B. Conversion of Missing Resin

58.     The Court now turns to the Plaintiffs' claim that Pilot converted Cornerstone's resin for its own use.

18

59.     Under Ohio law, for a bailor to recover against a bailee, he must establish a contract of bailment, delivery of the bailed property to the bailee, and a failure of the bailee to redeliver the property.   *See David v. Lose*, 218 N.E.2d 442 (Ohio 1966). "[W]rongful intent is not essential, it being sufficient if the owner has been deprived of his property by the act of another assuming an unauthorized control over it."   *Aetna Casualty & Surety Co. v. Higbee Co.*, 76 N.E.2d 404 (Ohio App. 1947).

60.     Likewise, under Texas law, to establish a claim for conversion of personal property against a bailee, a plaintiff must prove that: (1) the plaintiff owned or had legal possession of the property or entitlement to possession; (2) the defendant unlawfully and without authorization assumed and exercised dominion and control over the property to the exclusion of, or inconsistent with, the plaintiff's rights as an owner; (3) the plaintiff demanded return of the property; and (4) the defendant refused to return the property. *Whitaker v. Bank of El Paso,* 850 S.W.2d 757, 760 (Tex. App. - El Paso 1993, no writ). Wrongful intent is not an element of conversion under Texas law.   *Thomas v. McNair,* 882 S.W.2d 870, 884 (Tex. App.-Corpus Christi 1994, no writ).

61.     Here, the Plaintiffs seek to establish that Cornerstone's bailee, Pilot, converted 23,542 pounds of clear resin and 230,704 pounds of cloudy resin.   The Plaintiffs' claim is based on Cornerstone's records regarding how much resin it ordered for delivery to Pilot, Cornerstone's estimate of how much resin was left in the silos at Pilot's facility during Cornerstone's physical inventory, and how much Pilot should have used in the items manufactured for Cornerstone.   The Plaintiffs value the missing resin at $153,085.86 based on the price of resin per pound as of November 2, 2005.

62.     However, the evidence presented at trial established that there were significant problems with Cornerstone's accounting and inventory methods. Cornerstone's books and records had not, historically, accurately predicted the amount of resin, finished goods and work in progress actually located at its contract molders' facilities.   Prior to filing for bankruptcy, Cornerstone had previously experienced variances of as much as 500% between the inventory in its books and records and the actual materials on hand at its contract molders' facilities.

63.     Moreover, the silos in which Pilot stored Cornerstone's resin were not marked or calibrated in any way that would have allowed Cornerstone to accurately measure the volume of resin in the silos during physical inventories.

64.     Mr. Jendrisak testified, credibly, that when Pilot received resin from Cornerstone, it weighed and recorded the amount of each shipment.  According to Pilot's records, it received 7,560,970 pounds of cloudy resin and 1,758,000 of clear resin from or on behalf of Cornerstone.  The missing amount of cloudy resin that Cornerstone claims Pilot converted (230,704 pounds) is approximately 3% of the total cloudy resin Pilot's records show that it received, and the missing amount of clear resin (23,542 pounds) is approximately 1% of the total clear resin Pilot's records show that it received.

65.     With respect to the whereabouts of this missing resin, Mr. Jendrisak testified, credibly, that Pilot used the resin to manufacture products for Cornerstone.  Mr. Jendrisak testified that Cornerstone provided poor quality resin that increased "slippage" rate during the last few months that Pilot manufactured products for Cornerstone.   In other words, as a result of poor quality resin, Pilot used more resin to manufacture products for Cornerstone than predicted by the formulas used by Cornerstone when

determining how much resin should have remained at Pilot's facility.

66.    For all the foregoing reasons, the Court concludes that the Plaintiffs have failed to establish that Pilot converted Cornerstone's resin.  The Plaintiffs' conversion claim and their objection to Pilot's proof of claim based on Pilot's alleged conversion of Cornerstone's resin will be denied.

### C. Turnover of Resin, Finished Product, Work in Progress and Molds

#### 1. Ownership of Manufactured Goods (in Process and Finished)

67.    The filing of a voluntary petition commences a bankruptcy case and creates a bankruptcy estate.  *See* 11 U.S.C. §§ 301, 541(a).  Such property interests include "all legal or equitable interests of the debtor in property as of the commencement of the case," without regard to the fact that the debtor is not in possession of the property. 11 U.S.C. § 541(a)(1).  However, where raw materials owned by the debtor have been placed in the hands of another for manufacture and it is agreed that the entire output should be delivered to the debtor, title to the goods (in process and finished) depends upon the parties' intention.  *See Hope Shoe Co. v. Advance Wood Heel Co.,* 195 A.669 (N.H. 1937); *and see generally* CJS Bailments §32, *Title and Right to Property (of Bailor)* (collecting cases).

68.    In this case, there is no dispute that, when Cornerstone filed for bankruptcy, Pilot was in possession of approximately 11,000 pounds of cloudy resin supplied by Cornerstone as well as approximately 24,000 pounds of work in progress manufactured for Cornerstone.  Pilot asserts a statutory lien on these materials, rather than an ownership interest, in its proof of claim.  Additionally, the Plaintiffs established at trial that Cornerstone included inventory located at its molders' facilities, including

Pilot's facility, in its daily borrowing certificates to Fleet.

69.     It appears from the record that the parties did not intend Pilot to have any ownership interest in the work in progress and finished goods manufactured for Cornerstone. The Court concludes that, under the circumstances, any work in progress or finished products in Pilot's possession at the time Cornerstone filed for bankruptcy became "property of the estate" within the meaning of §541 of the Bankruptcy Code.

### 2. The Plaintiffs' Standing

70.     At trial, Pilot argued that the Plaintiffs lack authority to pursue a turnover claim against it. In general, only a trustee or debtor in possession may bring turnover proceedings. *See* 11 U.S.C. §542(a). A debtor-in-possession normally loses the right to bring turnover actions after the effective date of a confirmed plan of reorganization. *See In re Ice Cream Liquidation*, 319 B.R. 324, 333 (Bankr. D. Conn. 2005); *Petrowax P.A., Inc. v. C&C Petroleum & Chemicals Group, Inc. (In re Petrowax P.A., Inc.),* 200 B.R. 538, 540 (Bankr. D. Del. 1996). However, the Bankruptcy Code permits the post-confirmation debtor to retain the powers of a trustee if the confirmed plan so provides. *See* 11 U.S.C. §1123(b)(3)(B). *See International Asset Recovery Corp. v. Thomson McKinnon Securities Inc.,* 335 B.R. 520, 525 (S.D. N.Y. 2005).

71.     In this case, the Second Amended Plan reserves in the Trust every power granted to a trustee under the Bankruptcy Code. *See* Second Amended Plan, art. VII, §7.06(t). Such power includes the ability to bring turnover proceedings. Therefore, the language of the Plan is sufficient to give Cornerstone and Sundance, as representatives of the estate pursuant to §1123(b)(3) of the Bankruptcy Code, continued standing to bring post-confirmation turnover proceedings. *See* Second Amended Plan, art. X, §10.02

### 3. Turnover of Property of the Estate

72.      In order to aid the trustee or the debtor-in-possession in collecting the property of the estate, §542 provides that, with two exceptions not relevant here, "an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 ..., or that the debtor may exempt under section 522 ..., shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate." 11 U.S.C. §542(a).  This provision creates an affirmative obligation on the part of the party holding estate property to turn the property over.  This affirmative obligation is self-executing and does not require the holding of a hearing or the entry of an order by the bankruptcy court.  *See, e.g., In re Knaus,* 889 F.2d 773, 775 (8th Cir. 1989); *Matter of USA Diversified Products, Inc.,* 100 F.3d 53, 56 (7th Cir. 1996).

73.      In this case, the molds and resin supplied by Cornerstone have significant value.  Cornerstone previously received aggregate offers of $172,075, including bid premiums, in connection with an attempted auction of the molds.  The raw material resin remaining in Pilot's possession also has some value.  As of November 2005, clear resin had a market value of $0.63 a pound and cloudy resin had a market value of $0.60 cents a pound.  However, with respect to the Plaintiffs' demand for turnover of any work in progress in Pilot's possession at the time Pilot ceased molding for Cornerstone, the Plaintiffs failed to establish that these items have any consequential value.[4]

74.      In determining the scope of §542(a), the U.S. Supreme Court has stated:

---

[4] The works in process are merely parts of larger products and are of extremely limited, if any, usability.  In fact, the only value the Plaintiffs assert for the works in process is the value of the resin used to make them.  Although the Plaintiffs treated resin that would be produced by grinding down the works in process as having the same value as cloudy resin, the Plaintiffs failed to establish that re-ground resin would have the same market value as raw cloudy resin (or any market value at all).

23

> As does all bankruptcy law, § 542(a) modifies the procedural rights available to creditors to protect and satisfy their liens. In effect, §542(a) grants to the estate a possessory interest in certain property of the debtor that was not held by the debtor at the commencement of reorganization proceedings. The Bankruptcy Code provides secured creditors various rights, including the right to adequate protection, and these rights replace the protection afforded by possession.

*U.S. v. Whiting Pools, Inc.,* 462 U.S. 198, 206-207 (1983) (footnotes and citations omitted)  Accordingly, §542(a) of the Bankruptcy Code, as interpreted by *Whiting Pools,* requires Pilot to turn over Cornerstone's molds and resin to Cornerstone, even if the molds and resin are subject to Pilot's lien.  The Bankruptcy Code has replaced Pilot's right to possession with other rights, such as the right to adequate protection.  Moreover, Pilot's affirmative obligation is not subject to any alleged right of setoff or recoupment. *Compare* 11 U.S.C. §542(a) *with* 11 U.S.C. §542(b).

75.     Accordingly, the Court concludes that the Plaintiffs' claims for turnover of the molds and resin in Count 13 of the Complaint should be sustained.

### D. Objection to Pilot's Claim

76.     A proof of claim, if it is executed and filed in accordance with the Federal Rules of Bankruptcy Procedure, constitutes *prima facie* evidence of the validity and amount of that claim.  FED. R. BANKR. P. 3001(f); *Matter of Fidelity Holding Co., Ltd.,* 837 F.2d 696 (5th Cir. 1988).  Bankruptcy Rule 3001 generally sets forth the requirements for filing a proof of claim, and one of those requirements states that:

> when a claim . . . is based on a writing, the original or a duplicate shall be filed with the proof of claim.  If the writing has been lost or destroyed, a statement of the circumstances of the loss or destruction shall be filed with the claim.

FED. R. BANKR. P. 3001(c). Likewise, if a creditor claims a security interest in property of the debtor, Bankruptcy Rule 3001(d) requires the creditor to accompany his proof of claim with evidence that the creditor perfected a security interest.

77.     The Bankruptcy Code provides that "parties in interest" may object to any claim filed in the bankruptcy. *See* 11 U.S.C. §502(a). Section 1109 of the Bankruptcy Code describes a party in interest as "the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder*,* or any indenture trustee" and gives said parties the right to "appear and be heard on any issue in a case under this chapter." 11 U.S.C. §1109.

78.     The burden of persuasion under the bankruptcy claims procedure always lies with the claimant, who must comply with Bankruptcy Rule 3001 by alleging facts in the proof of claim that are sufficient to support the claim. If the claimant satisfies these requirements, the burden of going forward with the evidence then shifts to the objecting party to produce evidence at least equal in probative force to that offered by the proof of claim and which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency. If the objecting party meets this evidentiary requirement, then the burden of going forward with the evidence shifts back to the claimant to sustain its ultimate burden of persuasion to establish the validity and amount of the claim by a preponderance of the evidence. *See In re Consumers Realty & Dev. Co.*, 238 B.R. 418 (B.A.P. 8th Cir. 1999); *In re Alleghany Int'l, Inc.*, 954 F.2d 167, 173-74 (3d Cir. 1992).

79.     Here, the Court has previously determined that Pilot's claim is unsecured. With respect to whether the resin Sundance claims is missing should be offset against this amount, the Court is not convinced that any conversion occurred. With respect to

whether the value of the raw material resin in Pilot's possession should be offset against Pilot's claim, such a reduction of Pilot's claim would provide Sundance with duplicative relief, since the Court has determined that Pilot must turnover these items to Sundance. Finally, with respect to the Plaintiffs' request for an offset based on Pilot's alleged failure to pay amounts due on invoices sent by Cornerstone to Pilot for materials ordered by Pilot, the Court has reviewed the exhibits and trial record and has not found evidence of such invoices.[5]

### CONCLUSION

For the foregoing reasons, Pilot shall be allowed an unsecured claim in the amount of $762,443.64. The Plaintiffs' claim against Pilot for turnover of the molds and resin shall be granted. In light of the Court's decision regarding Pilot's unsecured status, the Court need not address the priority of the secured claim asserted by FUB in the molds in Pilot's possession.

The Court will enter a separate Judgment consistent with these Findings of Fact and Conclusions of Law. To the extent that any finding of fact is construed to be a conclusion of law, it is hereby adopted as such. Likewise, to the extent any conclusion of law is construed to be a finding of fact, it is hereby adopted as such. The Court expressly reserves the right to make additional findings as necessary or as requested by any party.

Signed on 12/5/2007

*Brenda T. Rhoades*    SR

HONORABLE BRENDA T. RHOADES,
UNITED STATES BANKRUPTCY JUDGE

---

[5] In contrast, there was evidence at trial of invoices that had not been paid by Champion.