

EOD
03/31/2008

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| CORNERSTONE PRODUCTS, INC., | § | Case No. 05-53533 |
| | § | (Chapter 11) |
| Debtor. | § | |
| _____ | § | |
| CORNERSTONE PRODUCTS, INC. | § | |
| and SUNDANCE GENERAL, LLC, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Adv. Proc. No. 05-4217 |
| | § | |
| CHAMPION MOLDED PLASTICS, INC., | § | |
| | § | |
| Defendant. | § | |

**ADDITIONAL FINDINGS OF FACT AND CONCUSIONS OF LAW
WITH RESPECT TO THE CLAIMS AGAINST
<u>DEFENDANT CHAMPION MOLDING PLASTICS, INC.</u>**

This matter is before the Court following the trial of the Second Amended Complaint to Determine Validity and Priority of Alleged Liens, Allowance of Claims, Avoidance of Preferential Transfers, Conversion of Property and for Turnover (the "<u>Complaint</u>") filed by Cornerstone Products, Inc. ("<u>Cornerstone</u>") and Sundance General, LLC ("<u>Sundance</u>," together with Cornerstone, the "<u>Plaintiffs</u>") against Pilot Plastics, Inc. ("<u>Pilot</u>"), Champion Molded Plastics, Inc. ("<u>Champion</u>"), and First United Bank and Trust Co. ("<u>FUB</u>"). The Court's prior Findings of Fact and Conclusions of Law entered on December 5, 2007, addressed the Plaintiffs' claims against Pilot and FUB. Following the entry of those Findings of Fact and Conclusions of Law, it came to the Court's attention that the claims asserted by Sundance against Champion were not resolved by the Agreed Final Judgment entered against Champion on March 2, 2007. In particular,

Sundance's Complaint includes claims that: (1) Champion converted Sundance's molds and equipment (**Count 10**); and (2) Sundance is entitled to turnover of all resin and inventory in Champion's possession (**Count 13**).

These Additional Findings of Fact and Conclusions of Law incorporate and supplement those previously entered by the Court. Capitalized terms shall have the same meaning as ascribed in the Findings of Fact and Conclusions of Law entered on December 5, 2007.

## **FINDINGS OF FACT**

### *Facts Specific to Champion*

1.  Champion entered into a manufacturing agreement with Cornerstone in or around January 2003. Additionally, Champion executed a Bailment Agreement with Cornerstone on or about January 20, 2003.

2.  Cornerstone supplied its molds to Champion pursuant to the Bailment Agreement. The first numbered paragraph of Champion's Bailment Agreement includes the following provision: "Upon the termination of this Agreement, Molder shall immediately deliver the Molding Equipment to Cornerstone, subject to the terms of the molders lien provided for under Ohio law." The fourth numbered paragraph states, in pertinent part, that "Molder shall keep the Molding Equipment free and clear of all liens and encumbrances except those provided by Ohio law."

3.  Champion used the molds to manufacture trash cans, storage totes and small wastebaskets under the Cornerstone name. Cornerstone would request that Champion mold particular products for it by generating a purchase order to Champion. Cornerstone would also provide Champion with a bill of materials, in which Cornerstone

specified the materials to be used and agreed to pay Champion a certain amount per hour for the machines used to mold the products. The "press price" or "machine rate" was approximately $120 per hour.

4. From January 2003 through September 2005, Cornerstone supplied Champion with the raw resin used to manufacture Cornerstone's products. Other than the resin, Champion supplied the materials used to manufacture products for Cornerstone and prepare those products for shipping, including colorant, cardboard and other accessories (such as shrink wrap and labels). These materials were typically colored and marked in such a way that they could not be used for other customer's products.

5. All of the products manufactured by Champion for Cornerstone involved at least two pieces. Once all of the pieces were molded, Champion would assemble the product and package it based on Cornerstone's specifications. Champion would then ship the product to Cornerstone's warehouse and generate an invoice to Cornerstone. It frequently took several shipments to complete one of Cornerstone's purchase orders.

6. In its Schedule D, Cornerstone listed Champion as a secured creditor with a disputed claim in the amount of $371,401.96. Cornerstone stated in Schedule D that Champion claimed a "[m]olders' lien per statutes," and Cornerstone valued the molds possessed by Champion at $1,088,681.37. On or about August 15, 2005, Champion filed a secured claim against Cornerstone in the amount of $789,145.50, asserting that its claim was secured by the molds in Champion's possession.

7. Champion continued molding product for Cornerstone after Cornerstone filed for bankruptcy. However, Cornerstone ceased providing resin to Champion at the end of September 2005. After September 2005, Champion provided the resin for the

products it manufactured for Cornerstone.

8. In late October or early November 2005, Cornerstone ceased accepting orders from customers. Champion ceased molding product for Cornerstone in or around October 2005. In a letter dated October 20, 2005, Cornerstone demanded that Champion return its molds pursuant to the Bailment Agreement.

9. On November 2, 2005, Cornerstone conducted a physical inventory count of resin, product in process, and finished product belonging to Cornerstone located on the business premises of Champion. Cornerstone's inventory reflected that all of the resin supplied to Champion had been used to manufacture goods for Cornerstone (*i.e.*, Champion was no longer in possession of any of the raw resin supplied by Cornerstone). The Cornerstone products located at Champion's facility consisted of a number of incomplete items, such as trash can lids without bases. These incomplete items resulted from overruns from purchase orders as well as Cornerstone's decision to cancel certain purchase orders after Champion had begun the manufacturing process.

10. According to Sundance, the Cornerstone products located at Champion's facility as of November 2, 2005 were worth the total amount of $143,086.86. Sundance's Exhibit 17 details this claim. However, the total value of the items listed on Sundance's Exhibit 17 is only $126,872.45. In particular, Sundance's Exhibit 17 lists a value of $39,384.45 for the resin used to manufacture the bases located at Champion's facility on November 2, 2005 and a value of $87,488 for the Cornerstone lids located at Champion's facility on November 2, 2005.

11. Sundance's valuation of the lids located at Champion's facility is based on a "standard cost" for the products as of November 2, 2005. This standard cost includes,

4

but is not limited to, the value of the resin used to make the products.

12. Sundance's valuation of the bases located at Champion's facility is based on the cost of raw resin as of November 2, 2005. The market price of raw resin fluctuates on a monthly basis.

13. Champion's comptroller, Julie Scribben, testified knowledgeably about the molding and related accounting processes at Champion. With respect to the lid for a 32-gallon trash can, which Cornerstone valued at $20,740.48 in its Exhibit 17, Ms. Scribben testified, credibly, that Champion purchased the resin and all the components necessary to make the lid. With respect to the dome lids on Exhibit 17 valued at $282.85 and the dome flappers valued at $22,609.28, Ms. Scribben further testified, credibly, that Champion had purchased these lids from Cornerstone.

14. With respect to the remainder of the lids listed on Sundance's Exhibit 17, Ms. Scribben testified that the lids that were molded in 2004 and early 2005. It is unclear from the record when Champion manufactured the bases that were located at its facility on November 2, 2005 or whether the bases were molded using resin supplied by Cornerstone. Ms. Scribben testified, credibly, that Cornerstone never paid Champion for its work on or material contributions to any of the items listed on Exhibit 17.

15. As of trial, only a small number of two types of lids (valued by Cornerstone at approximately $600) remained in Champion's possession. The remaining items had been ground up and sold or re-ground for use in other products manufactured by Champion. Ms. Scribben testified, credibly, that re-ground resin has a limited market value due to the contamination of the resin by colorant.

16. Post-petition and after November 2, 2005, Champion purchased and received materials from Cornerstone for use in molds for Cornerstone as well as its other customers. These materials included colorant and accessories (*e.g.*, nuts, wheels and axles for a wheeled trash can produced for Cornerstone), and some of the materials, such as labels, were specific to Cornerstone. Sundance claims that Champion owes Cornerstone at least the amount of $35,805.77 for these materials.

17. With respect to an outstanding post-petition debt owed to Sundance in the amount of $8,360.80 for colorant, Champion's comptroller testified that Champion purchased this colorant to use for another client's products. She further testified, credibly, that Cornerstone failed to offset a payment of approximately $6,800.00. The outstanding amount that Champion admits remains with respect to this debt owing is $1,487.70.

18. With respect to charges of approximately $30,000 for nuts, wheels and axles purchased from Cornerstone, these accessories were used by Champion to produce trash cans for Cornerstone. The finished trash cans were shipped to the Akron Storage Warehouse in several truck loads, and Champion invoiced Cornerstone upon Cornerstone's receipt of the trash cans at the Akron Storage Warehouse. However, three truck loads of the trash cans were of non-conforming quality and were returned by Cornerstone's customer to the Akron Storage Warehouse. The products were ultimately released to Champion by Cornerstone on March 15, 2006. The documentary evidence reflects that the products were released after negotiation by and between Champion and Cornerstone and that, in exchange for the transfer of ownership of the trash cans to Champion, Champion paid the storage fees that had accrued on the trash cans.

19. On March 23, 2006, Champion and Cornerstone entered into a Compromise and Settlement Agreement with respect to Champion's claims against Cornerstone and Champion's lien on Cornerstone's molds. Among other things, Champion agreed to release the molds to Cornerstone pursuant to the Compromise and Settlement Agreement. The Compromise and Settlement Agreement also contained the following release by Champion:

> Champion releases any claims, actions or causes of action of any type or character, known or unknown, that Champion may now have, previously had or at any time claimed to have against Cornerstone, its current and former agents, officers, directors, employees and affiliates. However, Champion does not release Cornerstone or FUB from any claims or obligations arising under this Settlement Agreement. The parties intend for this release to be construed broadly and to release Cornerstone of and from all debts, accountings, claims, mistakes, performances, demands, actions, causes of action, misrepresentations, liens, suits, reckonings, sums of money, judgments, obligations, and other liabilities whatsoever, both in law and in equity, which Champion ever had, now has, or which either of them or their agents, legal representatives, predecessors, successors or assigns, jointly or severally, claim to have for or by any reason of any matter, cause or thing whatsoever, from the beginning of the world to the date of this Release has had, whether known or unknown at the present time. Nothing in this Settlement Agreement shall in any way release any claims of Cornerstone or the Cornerstone Creditor's Trust against Champion.

20. In the parties' Joint Pre-Trial Order entered on December 13, 2006, Sundance describes its claim against Champion for conversion. Sundance asserts in the same paragraph that Champion failed to pay Cornerstone for materials purchased post-petition. Sundance states that it "seeks turnover of the Molds and Equipment in Champion's possession plus damages against Champion of $178,892.63 relating to Champion's failure to turnover Cornerstone's Resin and Inventory and the failure to pay Cornerstone amounts due on invoices sent to Champion." Joint Pre-Trial Order at ¶21.

**CONCLUSIONS OF LAW**

21. As a predicate legal matter, Champion complains that Sundance failed to bring any action against it for breach of contract with respect to post-petition obligations allegedly due and owing to Cornerstone. Sundance points out that this claim was included in the parties' Joint Pre-Trial Order. Federal Rule of Civil Procedure 16(d), as adopted and applied to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7016, provides in pertinent part that a pre-trial order "controls the course of an action …." Thus, in this case, the parties' Joint Pre-Trial Order supersedes the parties' prior pleadings and controls this action. *See Curtis v. Loether,* 415 U.S. 189, 190, n. 1 (1974) (where a claim was not included in the complaint, but was included in the pre-trial order, "it is irrelevant that the pleadings were never formally amended"); *Wilson v. Muckala,* 303 F.3d 1207, 1215 (10th Cir. 2002) ("[C]laims, issues, defenses, or theories of damages not included in the pre-trial order are waived even if they appeared in the complaint and, conversely, the inclusion of a claim in the pre-trial order is deemed to amend any previous pleadings which did not include that claim"); *Syrie v. Knoll Int'l,* 748 F.2d 304, 308 (5th Cir. 1984) ("[I]ncorporation of a [new] claim into the pre-trial order ... amends the previous pleadings to state [the new] claim").

*Conversion*

22. In the Joint Pre-Trial Order, Sundance complains that inventory and Cornerstone's product in process valued at $143,086.86 was located at Champion's facility on November 2, 2005. Sundance further complains that none of this inventory and product in process was returned to Cornerstone and, therefore, that Champion has converted Cornerstone's property to its own use. Champion disputes whether the

Cornerstone products located at its facility were the property of Cornerstone, asserting in the Joint Pre-Trial Order that it has not converted Cornerstone's property.

23. Sundance's conversion claim does not arise under the Bankruptcy Code – it is purely a state law claim. Bankruptcy courts apply the choice-of-law rules of the forum in which they sit over state law claims that do not implicate federal policy. *See, e.g., Woods-Tucker Leasing Corp. of Ga. v. Hutcheson-Ingram Dev. Co.,* 642 F.2d 744, 748 (5th Cir. 1981).

24. Texas courts use the "most significant relationship" test set forth in the Restatement (Second) of Conflicts to decide choice of law issues. *Hughes Wood Prods., Inc. v. Wagner,* 18 S.W.3d 202, 205 (Tex. 2000); *see also* RESTATEMENT (SECOND) OF CONFLICT OF LAWS §§ 6, 145 (1971). In tort suits alleging injury to tangible things, the Restatement Second directs application of the local law of the state of injury unless another state has a "more significant relationship ... to the occurrence." RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 147 (1971). The comments to this section of the Restatement Second address conversion expressly and state that if a conversion has been committed, "the resulting rights and liabilities of the parties, will be determined by the local law of the state which, with respect to the particular issue, has the most significant relationship to the occurrence, the chattel, and the parties." *Id.* § 147cmt. i.

25. Here, Champion's manufacturing facility is located in Ohio. Cornerstone shipped resin to Ohio, and Champion used the resin to manufacture products for Champion in Ohio. The products that Sundance allegedly converted were located in Ohio, and the conversion allegedly occurred in Ohio. This Court, therefore, will apply

the laws of Ohio in determining whether Sundance has established a claim for conversion.

26. In order to prevail on a claim of conversion under Ohio law, the plaintiff must prove by a preponderance of the evidence that "the defendant wrongfully exercised dominion and control over property in exclusion of or inconsistent with the plaintiff's rights." *Joyce v. General Motors Corp.* 551 N.E. 2d 172, 175 (Ohio 1990). The elements of conversion include: "(1) plaintiff's ownership or right to possession of the property at the time of the conversion; (2) defendant's conversion by a wrongful act or disposition of plaintiff's property rights; and (3) damages." *Dice v. White Family Cos.,* 878 N.E.2d 1105, 1109 (Ohio App. 2007). "The plaintiff in a conversion action must have been deprived of actual or constructive possession of personalty to which the plaintiff is entitled." *New Rocky Valley Farms; One Greenstreet, Inc. v. First National Bank of Dayton,* 482 N.E. 2d 1255, 1259 (Ohio App. 1984).

27. In this case, Champion disputes Cornerstone's ownership of and right to the inventory and work in progress located at Champion's facility. Champion argues that its efforts transformed the resin provided by Cornerstone and that the products of Champion's efforts did not become Cornerstone's property until they were delivered to Cornerstone at the Akron Storage Warehouse. Sundance asserts in opposition that the parties intended that Cornerstone would own the inventory and work in progress manufactured by Champion – in other words, according to Sundance, Champion was the bailee of the resin provided by Cornerstone as well as the products manufactured from Cornerstone's resin.

28. The parties' written Bailment Agreement relates to the "Molding Equipment" provided by Cornerstone. The term "Molding Equipment" is defined in the Bailment Agreement as "certain molding equipment and related tools, dies and fixtures." The fact that this definition does not include resin or inventory does not end the Court's inquiry since, under Ohio law, a contract of bailment may be express or implied. *See, e.g., Agricultural Ins. Co. v. Constantine* 58 N.E. 2d 658, 663 (Ohio 1944).

29. The term "bailment" is usually defined as "[a] delivery of personal property by one person (the *bailor*) to another (the *bailee*) who holds the property for a certain purpose under an express or implied-in-fact contract." BLACK'S LAW DICTIONARY (8th ed. 2004). Bailment transactions have traditionally included delivery of goods or personal property which are returned to the bailor in the same form in which they were delivered. *See Collins v. Click Camera & Video, Inc.,* 621 N.E.2d 1294, 1296 (Ohio App. 2d 1993). Thus, for a bailor to recover against a bailee under Ohio law, he must establish a contract of bailment, delivery of the bailed property to the bailee, and a failure of the bailee to redeliver the property. *See David v. Lose*, 218 N.E.2d 442 (Ohio 1966). "[W]rongful intent is not essential, it being sufficient if the owner has been deprived of his property by the act of another assuming an unauthorized control over it." *Aetna Casualty & Surety Co. v. Higbee Co.*, 76 N.E.2d 404 (Ohio App. 1947).[1]

30. "However, as a result of the increasing complexity of commercial relationships, the law of bailments has expanded to include many new and varied

---

[1] Likewise, under Texas law, to establish a claim for conversion of personal property against a bailee, a plaintiff must prove that: (1) the plaintiff owned or had legal possession of the property or entitlement to possession; (2) the defendant unlawfully and without authorization assumed and exercised dominion and control over the property to the exclusion of, or inconsistent with, the plaintiff's rights as an owner; (3) the plaintiff demanded return of the property; and (4) the defendant refused to return the property. *See, e.g., Whitaker v. Bank of El Paso,* 850 S.W.2d 757, 760 (Tex. App. -- El Paso 1993, no writ). Wrongful intent is not an element of conversion under Texas law. *See, e.g., Thomas v. McNair,* 882 S.W.2d 870, 884 (Tex. App. -- Corpus Christi 1994, no writ).

11

transactions." *See Collins,* 621 N.E.2d at 1296. "Among these transactions is the bailment of incomplete goods for the purpose of having the bailee manufacture, repair, or otherwise improve them." *Id.*

> Where property in an unmanufactured state is delivered by one person to another, on an agreement that it shall be manufactured or converted in form, or there is a delivery of chattels under an agreement that the party receiving them shall improve them by his labor or skill, whether the transaction constitutes a sale or a bailment depends generally on whether the product of the identical articles delivered is to be returned to the original owner, though in a new form. If it is to be so returned, it is a bailment …. The intention of the parties is the controlling factor ….

*Id*. at 1296-97 (quotation omitted). *See also Hope Shoe Co. v. Advance Wood Heel Co.,* 195 A. 669, 671 (N.H. 1937); *and see generally* CJS Bailments §32, *Title and Right to Property (of Bailor)* (collecting cases). In *Collins*, for example, Collins deposited movie film with Click Camera for transfer onto video tape, and Click Camera was expected, and it agreed, to redeliver to him the original movie film after this purpose was accomplished. The court held that the parties' agreement created a traditional bailment transaction with respect to the original movie files and a bailment of goods delivered in an unmanufactured state with respect to the newly created video tapes.

31.     In this case, Champion was expected, and it agreed, to transform the raw resin provided by Cornerstone into something entirely different through its labor and the addition of essential materials -- such as colorant. Sundance asserts that Cornerstone's pre-petition actions show that it believed it owned the products manufactured by Champion by, for example, including these items among the property that it offered as security for certain of its creditors' claims. However, the issue of the parties' intent is not as clear as Sundance would make it. The testimony and the documentary evidence reflect that finished goods produced by Champion were shipped by Champion to Cornerstone to

12

the Akron Storage Warehouse FOB.[2]  Moreover, Cornerstone did not pay Champion when it changed or cancelled orders, and Cornerstone did not assert an ownership interest in the finished goods until they arrived at the Akron Storage Warehouse.

32.  In addition to the law of bailment, the doctrine of accession applies where one makes alteration in the form of another's personal property.  This application of this doctrine to cases involving manufacturing is discussed in Ohio jurisprudence as follows:

> If, in such a case, the thing itself is changed into a different species, or its value greatly enhanced, as where cloth is manufactured out of wool, the person who made the change may acquire title by accession, subject only to his or her obligation to make satisfaction to the former owner for the value of the materials which he or she converted.  The original owner is entitled to such property in its state of improvement, however, unless the identity of the original materials has been destroyed, the thing has been annexed to and made a part of some other thing which is the principal, or its nature has been changed.

1 OH. JUR. 3d Accession §1, *Generally* (Feb. 2008).  Under Ohio law, "[i]t has been held that manufacturing and processing '. . . imply essentially a transformation or conversion of material or things into a different state or form from that in which they originally existed.'"  *Bird & Son, Inc. v. Limbach*, 543 N.E.2d 1161, 1164 (Ohio 1989) (discussing whether equipment utilized in the manufacturing process was exempt from Ohio tax).

33.  Applying these principles to the present case, the Court concludes that title to the lids and bases remaining at Champion's facility on November 2, 2005 belonged to Champion.[3]  Champion is entitled to the reasonable value of its material contributions and the work done for Cornerstone.  *See Kirkland v. Archbold*, 113 N.E.2d 496, 500-501

---

[2] "FOB" stands for "[f]ree on board" and is a "delivery term which requires a seller to ship goods and bear the expense and risk of loss to the F.O.B. point designated. The invoice price includes delivery at seller's expense to that location.  Title to goods usually passes from seller to buyer at the FOB location." BLACK'S LAW DICTIONARY 642 (6th ed.1990).

[3] In order for a bailment relationship to exist with respect to these goods, Cornerstone is required to have paid Champion for the items it produced for Cornerstone.  *See Thomas v. Connally*, 332 N.E.2d 87, 89 (Ohio Mun. 1974).  Cornerstone has not done so.

13

(Ohio App. 1953) (noting that the law of bailment clearly recognizes that a defaulting bailee who has enhanced the property of the bailor is entitled to the "reasonable value of the work done, less whatever damage the other party has suffered"). Sundance, however, is entitled to the value of the resin used to manufacture the lids and bases that were located at Champion's facility on November 2, 2005.

34. Cornerstone's comptroller, Jeannie Forgie, testified as to the value of the resin provided by Cornerstone. Her testimony on this issue is summarized by Sundance's Exhibit 17, which lists the "standard cost" for each of the lids located at Champion's facility on November 2, 2005. This standard cost includes labor and materials, such as colorant, contributed by Champion. However, Cornerstone has not paid Champion for the labor and materials contributed, such as colorant, to any of these goods.

35. Sundance's Exhibit 17 also lists a "standard cost" for the resin used to manufacture the bases located at Champion's facility on November 2, 2005. According to Sundance, this figure reflects the market cost of virgin resin as of approximately November 2, 2005. Ms. Forgie, however, testified that the market cost changed each month. Sundance failed to provide any evidence of what it actually paid for the resin, which had been supplied to Champion many months prior to November 2, 2005.

36. As previously discussed, damages is an element of a conversion claim under Ohio law. *See Dice v. White Family Cos.,* 878 N.E.2d at 1109. Inasmuch as Sundance failed to establish by a preponderance of the evidence the value of the resin converted by Champion, Cornerstone's conversion claim must be denied.

*Turnover*

37. Sundance asserts a claim for turnover in its Complaint as well as in the parties' Joint Pre-Trial Order. This claim originally included Cornerstone's molds, products, and resin located at Champion's facility. However, the molds have been returned pursuant to the parties' Compromise and Settlement Agreement dated March 23, 2006, and Sundance admitted at trial that Champion had used all of the resin provided by Cornerstone to manufacture products for Cornerstone. Thus, the remaining issue for the Court to decide is Sundance's demand for damages based on Champion's failure to turnover the Cornerstone products in its possession on November 2, 2005.

38. The filing of a voluntary petition commences a bankruptcy case and creates a bankruptcy estate. *See* 11 U.S.C. §§ 301, 541(a). In order to aid the trustee or the debtor-in-possession in collecting the property of the estate, §542 provides that, with exceptions not relevant here, "an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 ..., or that the debtor may exempt under section 522 ..., shall deliver to the trustee, and account for, such property or the value of such property, *unless such property is of inconsequential value or benefit to the estate*." 11 U.S.C. §542(a) (emphasis added). This provision creates an affirmative obligation on the part of the party holding estate property to turn the property over. This affirmative obligation is self-executing and does not require the holding of a hearing or the entry of an order by the bankruptcy court. *See, e.g., In re Knaus,* 889 F.2d 773, 775 (8th Cir. 1989); *Matter of USA Diversified Products, Inc.,* 100 F.3d 53, 56 (7th Cir. 1996).

39. To prevail in a turnover action under §542(a), the party seeking turnover must establish (1) that the property is or was in the possession, custody or control of an entity during the pendency of the case, (2) that the property may be used by the trustee in accordance with §363 or exempted by the debtor under §522; and (3) that the property has more than inconsequential value or benefit to the estate. *See In re Bailey,* 380 B.R. 486, 490 (6th Cir. BAP 2008) (collecting authority). Once a prima facie case for turnover is established, the creditor has the burden of proving any claimed right of offset. *See In re Williams*, 61 B.R. 567 (Bankr. N.D. Tex. 1986).

40. It is well-settled that, in turnover proceedings, the party seeking turnover must prove both that the property at issue is property of the bankruptcy estate and that it is in the possession of the party proceeded against. *See, e.g., Maggio v. Zeitz (In re Luma Camera Service, Inc.),* 333 U.S. 56, 64 (1948); *Republic Nat'l Bank of Houston v. Sheinfeld (Matter of Goodson Steel Corp.),* 488 F.2d 776, 778 (5th Cir. 1974); *Amdura Nat'l Distribution Co. v. Amdura Corp. (In re Amdura Corp.),* 167 B.R. 640, 643 (D. Colo. 1994), *aff'd,* 75 F.3d 1447 (10th Cir. 1996). However, as previously discussed, the property at issue in this case was not property of the bankruptcy estate subject to turnover. Moreover, nearly all of the items listed in Sundance's Exhibit 17 have been sold or re-ground into resin.

41. Assuming for the sake of argument that the lids and bases located at Champion's facility on November 5, 2005 were property of Cornerstone's bankruptcy estate, Sundance failed to establish that Cornerstone could have used the goods listed in its Exhibit 17 or that these goods have any consequential value. Sundance failed to establish any use for these goods at all, except as a source of resin, and, Ms. Scribben

testified, credibly, that any resin produced by grinding up Cornerstone's products had a limited market value since it was contaminated by the colorant required by Cornerstone.

### *Breach of Contract*

42. Finally, Sundance asserts in the Joint Pre-Trial Order that Champion owes Cornerstone approximately $35,000 for materials sold to Champion post-petition. Champion disputes that it is required to pay Cornerstone for any of these invoices and asserts that it has a right of setoff, recoupment or credit with respect to the outstanding post-petition invoices. Sundance argues, in response, that Champion is precluded from asserting a right of setoff by the broad release included in the parties' Compromise and Settlement Agreement dated March 23, 2006.

43. At trial, Champion argued that Sundance's claim for outstanding post-petition invoices had been released to the extent those invoices were for materials used in several shipments of trash cans to Cornerstone. In particular, some of the trash cans and lids produced by Champion were of non-conforming quality, according to Cornerstone's client, and were returned to the Akron Storage Warehouse. Cornerstone ultimately released the allegedly non-conforming trash cans to Champion. In light of this release, Sundance may not now seek payment on outstanding invoices relating to the raw materials and accessories for such trash cans and lids. *Cf: Local 107 Office & Professional Employees Intern. Union v. Offshore Logistics, Inc.*, 380 F.3d 832, 834 (5th Cir. 2004) (discussing the elements of promissory estoppel).

44. With respect to the remaining invoice in the amount of $8,360.80 for colorant purchased on November 30, 2005, Champion admitted at trial that this colorant was used in another customer's products. However, Ms. Scribben testified, credibly, that

Cornerstone had failed to take into account a payment of $6,800.00 with respect to the invoice. Champion does not dispute that the remaining amount remains unpaid. Based on the documentary evidence and the credible testimony presented at trial, the Court concludes that Sundance has established a claim for breach of contract in the amount of $1,487.70.

45. Finally, with respect to Champion's defense of setoff, §553(b)(1) of the Bankruptcy Code allows the setoff of certain "mutual" debts under non-bankruptcy law. The Bankruptcy Code does not define the term "mutual." The general rule is that mutuality is satisfied when the offsetting obligations are held by the same parties in the same capacity and are valid and enforceable, and (if the issue arises in bankruptcy) both offsetting obligations arise either pre-petition or post-petition. *In re Davidovich,* 901 F.2d 1533, 1537 (10th Cir. 1990). In this case, Champion has not established an enforceable post-petition claim against Cornerstone and, indeed, has released such any such claim pursuant to the parties' Compromise and Settlement Agreement. The Court, therefore, concludes that Champion has failed to establish a right of setoff with respect to its post-petition obligation to Cornerstone on the disputed invoice in the amount of $1,487.70.

## CONCLUSION

For the foregoing reasons, Sundance's claims against Champion for conversion and turnover shall be denied, and Sundance's claim for failure to pay the net amount owing on the post-petition invoice for colorant shall be granted. The Court will enter a separate Judgment consistent with these Findings of Fact and Conclusions of Law. To the extent that any finding of fact is construed to be a conclusion of law, it is hereby

adopted as such. Likewise, to the extent any conclusion of law is construed to be a finding of fact, it is hereby adopted as such.

Signed on 3/31/2008

_Brenda T. Rhoades_  MD
HONORABLE BRENDA T. RHOADES,
UNITED STATES BANKRUPTCY JUDGE

19